**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 18-25446-CIV-ALTONAGA/Goodman**

**OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS,**

**Plaintiff,**

**-vs-**

**US MOVING SERVICES INC**, et. al,

**Defendants.**

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY AGAINST DEFENDANTS US MOVING SERVICES INC, MOVING & STORAGE SF INC, MOVING SYSTEMS INC AND YEHOSHUA VAKNIN**

## I. INTRODUCTION

The Plaintiff, OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS ("Florida Attorney General" or "Plaintiff"), by and through the undersigned Assistant Attorney General, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1 of the Southern District of Florida, hereby moves for summary judgment as to liability against Defendants, US MOVING SERVICES INC, d/b/a Safeway Moving & Storage, Apex Moving, Number One Van Lines, Moving Services, Proud American Vanlines, Up Line Moving, Spartan Moving, Spartan Van Lines and/or Prodigy Moving & Storage ("US MOVING"), MOVING & STORAGE SF INC, f/k/a Safeway Moving & Storage Inc, d/b/a Apex Moving & Storage, Moving and Storage Inc, Upline Moving and/or Prodigy Moving & Storage ("SAFEWAY MOVING"), MOVING SYSTEMS INC, f/k/a Spartan Moving System Inc, d/b/a Spartan Van Lines ("SPARTAN MOVING"), (collectively, US MOVING, SAFEWAY MOVING and SPARTAN MOVING are referred to as "Corporate Defendants"), and YEHOSHUA VAKNIN ("VAKNIN"), individually and as owner, officer and/or principal of US MOVING, SAFEWAY MOVING and SPARTAN MOVING (collectively, VAKNIN and the Corporate Defendants are referred to as "Defendants").

The undisputed evidence in this case demonstrates that since at least January 2014, VAKNIN, through one or more of the Corporate Defendants, has been operating as a motor carrier in violation of numerous state and federal laws.[1] The undisputed evidence further shows that VAKNIN falsely advertised these entities as being large, long established, professional movers staffed by well-trained employees who use the utmost care with consumers' belongings and are scrupulous in preparing and following estimates. In reality, the Defendants regularly used unskilled, untrained and unsupervised laborers who often damaged or stole consumers' property; the Defendants and their agents routinely provided deceptive, low ball estimates to consumers then coerced higher fees immediately before or during the scheduled move, in some cases essentially holding consumers' property hostage. Defendants' acts and practices have harmed hundreds of consumers.

The Florida Attorney General now moves for summary judgment against the Defendants: (1) permanently enjoining them from future direct or indirect (*per se)* violations of FDUTPA; (2) directing them to disgorge all ill-gotten gains plus prejudgment interest in an amount to be subsequently determined by the Court; (3) imposing civil penalties against them for their violations of FDUTPA, the I.T.C. and FMCSA Regulations in an amount to be determined by the Court; and (4) awarding costs and reasonable attorney's fees to Plaintiff.

This motion is based on the allegations in the Complaint, the separately filed Statement of Undisputed Material Facts ("*SUMF*") and the evidence cited therein, including the testimony of Defendant VAKNIN and several of his employees, as well as declarations from numerous consumers. Taken together, this evidence shows there are no genuine issues of material fact in dispute as to the liability of the Corporate Defendants in this case. Likewise, the evidence shows that Defendant VAKNIN controlled the Corporate Defendants and had knowledge of and participated in the Corporate Defendants' deceptive acts and practices. As such, there is no

[1] As described herein, the undisputed evidence shows that Defendants: (1) violated various provisions of Title 49 U.S.C., Subtitle IV, Part B ("Interstate Transportation Code" or "I.T.C."), including the regulations promulgated by the Federal Motor Carrier Safety Administration ("FMCSA") contained in Title 49 C.F.R., Chapter III, Subchapter B, Sections 350-399 ("FMCSA Regulations" or "the Regulations"); (2) directly violated the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes (hereinafter "FDUTPA"); and (3) violated the Florida Household Moving Services Act, Chapter 507, Sections 507.01-507.13, Florida Statutes ("Florida Moving Act" or F.M.A.), the I.T.C. and FMCSA Regulations, which constitute per se violations of FDUTPA.

genuine dispute as to any material fact, and the Plaintiff is entitled to summary judgment on the issue of liability as a matter of law.

## II. STATEMENT OF FACTS

### A. The Defendants' Moving Enterprise

At all times material hereto, Defendants US MOVING, SAFEWAY MOVING, and SPARTAN MOVING were active Florida corporations that were separately registered with the U.S. Department of Transportation ("USDOT") as interstate household goods motor carriers. [*SUMF* ¶¶1, 3, 5]. Defendant VAKNIN formed US MOVING in about August 2008 and thereafter was its sole officer (president) and owner. [*SUMF* ¶2]. VAKNIN also became the sole officer (president) and owner of Defendants SAFEWAY MOVING and SPARTAN MOVING in approximately May 2016 and August 2016, respectively. [*SUMF* ¶¶4, 6]. As sole owner and officer, VAKNIN controlled the daily operations of the Corporate Defendants; VAKNIN actively participated in and had knowledge of the Corporate Defendants' deceptive acts and practices. [*SUMF* ¶¶2, 4, 6-8, 14-20, 28, 31, 33, 36, 38, 42, 40, 45, 48-61, 64-65, 71, 76, 83].

At all times material hereto, the Defendants engaged in trade or commerce, and acted as "movers" or "household goods motor carriers" as defined by Florida and federal law.[2] [SUMF ¶¶9-10]. The Defendants advertised, solicited, provided, offered, sold or distributed services relating to moving, transportation, arranging for the transportation or the physical movement and/or storage of household goods (hereinafter "Moving Services") for consumers residing in Florida and throughout the United States. [*Id.*].

In about May 2016, VAKNIN began operating Defendants US MOVING and SAFEWAY MOVING as part of a common enterprise (the "Enterprise" or "Moving

---

[2] The term "household goods" or "goods" is defined within Section 13102 of the I.T.C. and Section 507.01(7) of the F.M.A., and includes personal effects and other personal property used, to be used or commonly found in a home, personal residence, or other dwelling, including, but not limited to, household furniture. The term "motor carrier" or "carrier" means any "person" (including an individual) who provides "motor vehicle" "transportation" for compensation as those terms are defined in Section 13102 of the I.T.C. (See also, Title 49 U.S.C. 13102 (14) and Title 1 U.S.C. 1). The term "shipper" means a person who uses the services of a "mover" to transport or ship household goods as part of a "household move" as those terms are defined within Section 507.01 of the F.M.A. A "mover" is defined in Section 507.01(9) of the F.M.A. as a person who, for compensation, contracts for or engages in the loading, transportation or shipment, or unloading of household goods as part of a household move.

Enterprise"). [*SUMF* at ¶11]. VAKNIN added Defendant SPARTAN MOVING to the Moving Enterprise upon obtaining control of that entity in about August 2016. [*SUMF* at ¶¶6, 11]. As part of a common enterprise, the Corporate Defendants shared common ownership, officers, employees, business functions, corporate systems, marketing activities, financial resources, operational assets (trucks and moving equipment) and office locations. [*SUMF* at ¶¶12-13]. Defendant VAKNIN also operated the Corporate Defendants under the same or substantially similar fictitious trade names [*SUMF* at ¶¶14-19], and commingled consumers' funds between the Corporate Defendants' accounts. [*SUMF* at ¶¶20-21].

**B. <u>Defendants' Deceptive Marketing</u>**

The Corporate Defendants utilized social media, telemarketing, emails and numerous websites to advertise and offer the Enterprise's Moving Services to consumers. [*SUMF* at ¶22, 55, 63-64]. The Enterprise's websites and other advertising materials contained numerous misrepresentations and omissions of material facts. [SUMF at ¶¶22-27, 30, 34-44, 46-48]. Defendant VAKNIN admitted he hired the web-design company that created each of the websites used by the Corporate Defendants to advertise their Moving Services. [*SUMF* at ¶¶49-50]. VAKNIN also admitted that he received copies of the draft website pages, and he reviewed "at least some of them" before authorizing that the websites be uploaded and displayed to the public over the Internet. [SUMF at ¶¶51-53]. He also admitted opening and reviewing the Corporate Defendants' websites online, after they had been uploaded and made available for viewing by the public. [SUMF at ¶54]. Thus, Defendant VAKNIN knew or should have known that the Moving Enterprise's websites contained the material misstatements and omissions, including those described below.

For example, the Corporate Defendant's websites and other advertising materials repeatedly misrepresented to the public that the Enterprise's employees and agents were highly experienced and trained, experts who would provide exceptional care for their customers' household goods during the moves. [*SUMF* at ¶23]. The Enterprise's websites claimed that the Corporate Defendants' offered professional moving services performed by highly skilled and knowledgeable movers who had received actual training and knew how to:

- ***pack items properly***, including "artwork and delicate antiques;" [*SUMF* at ¶24]
- "***expertly wrap*** and protect fragile items and furniture;" [*SUMF* at ¶25]
- "***efficiently load*** the truck to ***maximize space*** and ***prevent damage***;" [*SUMF* at ¶¶25-27]

- "***expediently transport*** and deliver [] shipment for a prompt and ***timely arrival***;" [*Id*.] and
- "***custom wrap and crate*** any item to make sure it gets to your destination ***without a scratch***." [*SUMF* at 25].

Likewise, another advertisement used by the Corporate Defendants [*see SUMF* at ¶¶55, 59] falsely stated:

- We are the ACTUAL CARRIER and service our moves directly;
- We Do NOT BROKER OR SUBCONTRACT
- Our movers are our employees… NOT DAY LABORERS OR CONTRACTORS
- Our movers are required to have…. MINIMUM OF 3+ YEARS OF PROFESSIONAL WHITE GLOVE moving experience

In fact, VAKNIN admitted that the Corporate Defendants did not always utilize highly experienced and trained, expert movers but instead, often employed unskilled and untrained day laborers (or "helpers") that their drivers located on Craigslist or other online labor pools to conduct the Moving Services. [*SUMF* at ¶28-29]. The Moving Enterprise did not conduct any background checks on these transient laborers and often paid them in cash without even retaining copies of the individual's driver's license or other identifying information. [*SUMF* at ¶30].

In addition, and contrary to their advertisements, the Corporate Defendants also regularly subcontracted their customers' moves to other interstate motor carriers who also used laborers that were not trained or supervised by the Corporate Defendants in any manner. [*SUMF* at ¶31]. Not surprisingly, numerous consumers nationwide experienced substantial damage, loss and/or theft of their household goods. [*SUMF* at ¶32]. Thereafter, Defendant VAKNIN often directed Enterprise employees not to provide any recompense or only a *de minimis* amount of compensation to consumers whose goods were lost, stolen or damaged. [*SUMF* at ¶33].

The Enterprise's websites and other advertisements also falsely portrayed the Corporate Defendants (and the fictitious entities (dba's) they created) as having an extensive and lengthy operating history within the moving industry, as well as having sufficient and substantial operational resources to accommodate the transportation and/or storage of consumers household goods throughout the country. [*SUMF* at ¶34]. For example:

- US MOVING's website falsely advertised that the company was engaged in business in the moving industry for over 10 years ("Established in 2005"), when in truth and in fact, neither it nor any of the Corporate Defendants existed in 2005 [*SUMF* at ¶¶2, 41, 42];

- SAFEWAY MOVING's website falsely advertised that the company had over 25 years' experience in the moving industry, when in truth and in fact the company did not commence any actual operations until 2016; [*SUMF* at ¶¶4, 35, 36];

- SAFEWAY MOVING's website for its fictitious entity, Prodigy Moving & Storage, falsely advertised that Prodigy Moving & Storage had been providing "expert Pro relocation services to thousands of …customers" since 2007, when in truth and in fact that entity was not even created and had no operating history until about September 2018, and SAFEWAY MOVING, itself, was only created in 2016; [*SUMF* at ¶¶37, 38];

- SAFEWAY MOVING, through its dba Apex Moving & Storage, sent an email advertisement to a consumer in June 2017 deceptively claiming Apex Moving & Storage was "family owned & operated" for "10 years," when in truth and in fact, this fictitious entity was created in about April 2017, and SAFEWAY MOVING, itself, was created in 2016; [*SUMF* at ¶¶58-59];

- SPARTAN MOVING's website for its dba Spartan Van Lines falsely advertised that this entity was established as a moving company in 2008, when in truth and in fact, SPARTAN MOVING was created March 2016, registered as a motor carrier in April 2016 and acquired by VAKNIN in August 2016; [*SUMF* at ¶¶5-6, 39-40];

- US MOVING's website falsely advertised that it had a "fleet of 20 trucks," when in truth and in fact, neither US MOVING, nor the Moving Enterprise itself, had more than four (4) trucks at any time, and only one (1) of which was a semi-truck that was available for interstate transportation; [*SUMF* at ¶¶41, 42];

- SAFEWAY MOVING's website for its dba Apex Moving & Storage falsely advertised that that this entity also had a "fleet of 20 trucks," when in truth and in fact, it had no trucks and thus regularly used unmarked or obviously rented vehicles (such as from U-Haul or Budget rental) for its intrastate moves, or hired other third-party subcontractors for interstate moves, and comingled consumers' goods with other consumers' goods on the same truck; [*SUMF* at ¶¶43-44];

- Defendant US MOVING's website falsely advertised that it owned a large "climate-controlled" facility with 10,000 square feet of available storage space, when in truth and in fact, it did not own any such storage facility; [*SUMF* at ¶46, 48]; and

- Defendant SAFEWAY MOVING's two (2) websites for its dba Prodigy Moving & Storage, falsely advertised that this entity had a large "climate-controlled" facilities with 20,000 to 25,000 square feet of available storage space, when in truth and in fact, they did not own or control any such storage facilities, but instead rented space along with other unrelated motor carriers at public storage facilities and privately owned warehouses; [*SUMF* at ¶47-48].

VAKNIN admitted that because the Corporate Defendants did not own enough semi-trucks for their interstate moves, they regularly had to hire other interstate moving companies as subcontractors to perform their Moving Services for their Moving Enterprise's customers. [*SUMF* at ¶¶28, 31, 60]. The Defendants did not train, supervise or control the subcontractors' laborers who were providing Moving Services for the Enterprise's customers. [*SUMF* at ¶¶30-31, 60].

Moreover, VAKNIN also admitted that, after the Corporate Defendants' agents would pick up a customer's household goods for interstate transport, those goods would routinely be off-loaded and stored in a public storage facility or warehouse until the Defendants could locate and hire another, third-party, interstate motor carrier (subcontractor) who had room on their semi-truck and was traveling to the same geographic region where the Defendants' customer was moving to. [*SUMF* at ¶61]. This routine practice of loading, then unloading and storing consumers' goods until they could be reloaded and combined with another interstate carrier's shipment, was not disclosed in any of the Corporate Defendants' websites or other solicitations; often, this practice caused substantial damage to or loss (or theft) of the consumers' property and/or created delays in transporting and delivering the consumers' household goods. [*SUMF* at ¶62].

**C. <u>Defendants' Unfair Estimates and Revisions</u>**

Many consumers who responded to the Enterprise's marketing efforts were directed to sales agents who spoke with the consumers over the telephone. [SUMF at ¶¶63-64]. In numerous instances, the Defendants' sales agents would orally quote the consumer a very low price for the requested Moving Services, without conducting a physical survey of the goods to be transported. [SUMF at ¶¶65-66]. The consumers would then be solicited to enter into an agreement with the Enterprise and to pay the Enterprise a substantial up-front deposit (often up to 30% of the quoted price). [SUMF at ¶¶66-68].

In most instances, consumers were then given an unsigned document purporting to be the "Binding Estimate" for their move, and many were led to believe that this "binding estimate" would essentially lock-in the amount the consumer would be required to pay to complete their household move. [SUMF at ¶67]. The Consumers' were told the initial deposit was refundable if the move was cancelled at least three (3) days before the scheduled pick up date. [SUMF ¶68].

In numerous instances, after the consumer's cancellation period had expired, and literally within a day or two of the scheduled pickup, a second sales agent from the Enterprise would contact the consumer under the guise of providing a "quality assurance review" relating to the consumer's move. [SUMF at ¶69]. During the purported "quality assurance review," this commission-based, sales agents often told consumers that their initial binding estimate was not accurate, that it materially understated the total charges for the Moving Services to be performed, and that a new "revised binding estimate" would have to be issued, which substantially increased (sometimes doubling) the original price quoted [SUMF at ¶¶70-72,]. At that point, these consumers had no reasonable or practical alternative but to acquiesce to the unexpected price hike, given the impending scheduled date for their move, or they were forced to forfeit the substantial deposit they had already paid to VAKNIN's Moving Enterprise. [SUMF at ¶73].

In numerous instances, on the day of pick-up and <u>after</u> loading of the consumer's goods had commenced or in some instances was completed, consumers were confronted with a significantly higher monetary demand than previously quoted and were required to sign a new "revised estimate" with the higher price, or else have their goods taken to storage. [SUMF at ¶74]. Many of these consumers had no reasonable or practical choice under the circumstances but to sign the "revised estimate" and pay the unexpected price hike to the driver, which was often required to be paid only in cash. [SUMF at ¶75]. VAKNIN was aware of these practices and paid the drivers a commission based on the higher amount being charged to the consumers and paid at the time of pick up. [SUMF at ¶¶76-77].

## III. THE COURT SHOULD ENTER SUMMARY JUDGMENT AGAINST DEFENDANTS

### A. Summary Judgment Standard

Summary judgment is appropriate where, as here, the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ.P. 56(a), (c). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment is an "integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citing Fed. R. Civ. P. 1). A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323; *see also Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 323; *see also FTC v. Lanier Law, LLC*, 194 F. Supp. 3d 1238, 1246 (M.D. Fla. 2016), aff'd, 715 Fed. Appx. 970 (11th Cir. 2017). The nonmoving party must do more to defeat a motion for summary judgment "than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*, 475 U.S. at 586 (1986); *see also Anderson*, 477 U.S. at 252 (The "mere existence of a scintilla of evidence" in support of the non-moving party's position is insufficient to overcome summary judgment). *See also*, *Miccosukee Tribe of Indians of Fla. v U.S.* 516 F.3d 1235, 1243 (11th Cir. 2008) (existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment).

Here, there are no material facts in dispute that (1) Defendants violated FDUTPA and multiple provisions of the I.T.C. and FMCSA Regulations in deceptively marketing and providing Moving Services to consumers, (2) the Corporate Defendants operated, and are liable, as a common enterprise, and (3) individual Defendant VAKNIN had the necessary level of involvement and knowledge to be individually liable.

**B. This Court Has Jurisdiction and Venue is Proper**

The Defendants do not dispute that this Court has subject matter jurisdiction pursuant to Section 14711(a) of the I.T.C., as well as supplemental jurisdiction over the state of Florida's claims pursuant to 28 U.S.C. Section 1367 and FDUTPA. [*See* D.E. 60 (Defendant's Answer) at ¶¶15, 16]. Likewise, venue is proper in this district under Section 14711(e) of the I.T.C. as the Defendants operated either as a broker or motor carrier in Dade County Florida, within the Southern District of Florida. [SUMF at ¶17].

Section 14711 of the I.T.C. authorizes the Plaintiff to bring a civil action on behalf of the residents of the State of Florida in an appropriate district court of the United States to enforce the consumer protection provisions of the I.T.C. that apply to individual shippers and are related to the delivery and transportation of household goods by a household goods motor carrier subject to jurisdiction under subchapter I of Chapter 135 of the I.T.C. Section 14711 also enables the Plaintiff to seek civil penalties authorized under the I.T.C. if the Plaintiff has reason to believe that the interests of the residents of the State of Florida have been or are being threatened or adversely affected by a carrier providing transportation

The Florida Attorney General is also an "enforcing authority" of FDUTPA, Section 501.207(1), Florida Statutes, and is authorized to bring an action seeking injunctive relief and other available equitable or statutory relief against any person who has violated, is violating, or is otherwise likely to violate FDUTPA. Section 501.207(1), Florida Statutes.

**C. The Defendants Directly Violated FDUTPA (Count 5)**

1. Applicable Standard for Deception and Unfairness under FDUTPA

Under FDUTPA, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. *Millennium Comm. & Fulfillment, Inc. v. State, Off. of the Atty. Gen*, 761 So. 2d 1256, 1260 (Fla.App. 3d DCA 2000).

Section 501.207(1)(b) of FDUTPA authorizes the Florida Attorney General to bring an action to "enjoin any person who has violated, is violating, or is otherwise likely to violate" FDUTPA. *State, Off. Of the Atty. Gen v Bilotti*, 267 So.3d 1, 3 (Fla.App. 4 Dist. 2019). Further, the Plaintiff is not required to plead or prove "actual damages" in an action seeking injunctive and other equitable relief (e.g., in the form of restitution for all consumers who have been injured), *id.*, and may seek additional ancillary relief, civil penalties and attorney's fees pursuant to Sections 501.207, 501.2075 and 501.2077, Florida Statutes.

A violation of FDUTPA includes any violation of the act or rules adopted under the act, and may be based upon any of the following: "(b) The standards of unfairness . . . set forth and interpreted by the Federal Trade Commission or the federal courts; [3] (c) Any law, statute, rule,

[3] When analyzing cases under FDUTPA, a court "deciding whether an act or practice may be deemed deceptive ... must give due consideration and great weight to the interpretations made by the Federal Trade Commission and the federal courts." *Millennium*, 761 So.2d at 1263.

regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Section 501.203(3), Florida Statutes.

Thus, a court may find a violation if the conduct in question is either: 1) unfair or deceptive, or 2) proscribed by existing standards, rules, or statutes and is therefore a "per se" FDUTPA violation. *See State, Off. of the Atty. Gen v. Father and Son Moving & Storage, Inc.*, 643 So. 2d 22 (Fla.App. 4th DCA 1994). Under FDUTPA, a practice may be deceptive without any showing of intent to deceive, and it may be found unfair to consumers without a showing that the offending party intended to cause consumer injury. *See e.g., Orkin Exterminating Co. v. FTC*, 849 F. 2d 1354, 1368 (11th Cir. 1988); *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1495 (1st Cir. 1989).

Moreover, under FDUTPA, the Attorney General is not required to prove that the act or practice actually caused any monetary damages, nor must it name each allegedly affected consumer or prove reliance by same. *See Bilotti*, 267 So.3d at 3 ("regardless of whether actual harm has materialized, the AG can seek an injunction to stop an unfair and deceptive trade practice that violates FDUTPA"); *Taubert v. State, Off. of the Att. Gen.*, 79 So.3d 77, 79 (Fla.App. 1st DCA 2011) (naming individual consumers is not required); *FTC v Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993) (proof of reliance by each consumer misled is not required and would "thwart effective prosecution of large consumer redress actions and frustrate the statutory goals of [the FTC Act]").

An act or practice is "deceptive" if it is likely to mislead a consumer acting reasonably in the same circumstances. *State, Off. of Atty. Gen. v. Wyndham Intern., Inc.*, 869 So.2d 592, 598 (Fla. 1st DCA 2004). Likewise, it is established that a violation of FDUTPA occurs when, in trade or commerce, "there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) (*citing Millennium*, 761 So. 2d at 1263).[4]

---

FDUTPA specifically provides: "It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the [FTC] and the federal courts relating to s. 5(a)(1) of the [FTC] Act . . ." Section 501.204(2), Florida Statutes.

[4] "Trade or commerce" means the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property,

Whether a representation is material, like the question whether a representation is likely to mislead consumers, is evaluated from the perspective of the "reasonable prospective purchaser." *FTC v Wash. Data Res.*, 856 F. Supp. 2d 1247, 1272 (M.D. Fla. 2012). A representation is likely to mislead if it has the capacity or tendency to deceive; that is, it is either false or lacks a reasonable basis. *Davis v. Powertel*, 776 So. 2d 971, 974 (Fla. 1st DCA 2000). Similarly, a representation is material "if it is of a kind usually relied upon by a reasonably prudent person." *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266 (S.D. Fla. 2007). Only a tendency to affect consumer's reliance is required; "subjective reliance by each victim" is not required. *Id*. at 1267 (citation omitted). Express claims are presumed material, s*ee FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994) and *FTC v. NPB Advertising, Inc.*, 218 F.Supp.3d 1352, 1358 (M.D.Fla. 2016); and consumer action based on express statements is presumptively reasonable. *See e.g., FTC v. Ivy Capital, Inc*. 2013 WL 1224613 *7 (D.Nev. Mar. 26, 2013); *FTC v. Five-Star Auto Club, Inc.*, 97 F.Supp.2d 502, 528 (S.D. N.Y. 2000).

In considering whether a claim is deceptive, a Court cannot rest on the literal truth or falsity of the representation but must consider the "net impression" being created, even when the solicitation contains some truthful disclosures. *See e.g., FTC v. Atlantex Assocs*., 1987-2 Trade Cas. (CCH) ¶ 67,788 at 59,254; *see also Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir.1976); *Removatron*, 884 F.2d at 1497; *FTC v Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006). Thus, implied claims as well as express claims may be deceptive, and a claim may be likely to mislead, even though it is literally true, based on the net impression created). *American Home Products v. FTC*, 695 F.2d 618, 687 (3d Cir.1982); *FTC v. Grant Connect, LLC*, 827 F.Supp. 2d 1199, 1214 (D.Nev 2011). Likewise, a representation is also deceptive if the maker of the representation lacks a reasonable basis for the claim. *See e.g., FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010).

Finally, an "unfair" act or practice is one in which the injury to the consumer (1) is substantial; (2) is not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) is an injury that consumers themselves could not reasonably have avoided. *See Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1098 (Fla. 3d DCA 2014); *see also Orkin Exterminating Co., Inc. v. FTC,* 849 F.2d at 1364.

---

whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. Section 501.203(8), Florida Statutes.

2. Defendants' Deceptive Advertising

As set forth above, the Corporate Defendants utilized numerous websites and email solicitations to advertise the Enterprise's Moving Services to consumers. The advertisements contained numerous false statements regarding objectively verifiable, factual statements, including misrepresentations regarding: (1) the number of years the Corporate Defendants (and their related fictitious entities) had been operating in the moving industry [*SUMF* at ¶¶2, 4, 35-42, 58, 59]; (2) the size of their companies and location of supposed offices throughout the country [*SUMF* at ¶¶80-82]; (3) the existence and size of their supposed "climate-controlled" storage facilities [SUMF at ¶¶ 46-48]; (4) the number of trucks they supposedly had in their "fleet" available for transporting consumers' household goods throughout the country [*SUMF* at ¶¶41-44].

Likewise, as indicated above, the Enterprise's website advertisements contained numerous and specific false and misleading representations and omissions of material facts regarding the nature and extent of their employee's training, experience and expertise in the moving industry. [*SUMF* at 23-27, 59]. Moreover, the Enterprise's email advertisements expressly misrepresented to consumers that the Corporate Defendants **did not broker or subcontract their moves**, nor did they **use any day laborers or contractors** [*SUMF* at ¶¶55, 59], when in truth and in fact, and as VAKNIN well knew, the Corporate Defendants regularly used subcontractors and day laborers in connection with providing Moving Services to their customers. [*SUMF* at ¶¶28, 29, 60-61].

As this Court previously ruled in connection with the Defendants' Motion to Dismiss, the representations contained within the Defendants' advertisements do not constitute "mere puffery." [See DE# 33, 44]. Instead, they contain specific, express and implied, factual representations that clearly are material and "likely to mislead consumers acting reasonably under the circumstances." See e.g., *Marty v. Anheuser-Busch Companies, LLC,* 43 F. Supp.3d 1333, 1342 (S.D. Fla. 2014); s*ee also FTC v. Pantron I Corp.*, 33 F.3d at 1095-96; *FTC v. NPB Advertising, Inc.*, 218 F.Supp.3d at 1358; *FTC v. Ivy Capital, Inc*. 2013 WL 1224613 *7; and *FTC v. Five-Star Auto Club, Inc.*, 97 F.Supp.2d at 528. By repeatedly touting their workers' training, skills and expertise, when they had no such attributes or qualifications, the net impression created by the Enterprise's advertisements was clearly deceptive. *See FTC v. Capital*

*Choice Cons. Credit, Inc.*, 02-21050 CIV, 2003 WL 25429612, at *4 (S.D. Fla. June 2, 2003) *aff'd*, 157 Fed. Appx. 248 (11th Cir. 2005).

Each of the above representations was material and likely to mislead consumers for several reasons. First, the Defendants made express representations, and express representations are presumptively material. *See Transnet*, 506 F.Supp. 2d. at 1266. ("Express claims, or deliberately-made implied claims used to induce the purchase of a particular product or service are presumed to be material."); *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999). Second, representations regarding the Defendants' industry experience, and the amount of it agents' training and expertise in moving, would go directly to "the heart of a consumer's decision to purchase" Moving Services from a motor carrier, and thus, are presumptively material. *FTC v. USA Beverages, Inc.*, 2005 WL 5654219, at *6 (S.D. Fla. Dec. 6, 2005), report and recommendation adopted, 2005 WL 5643834 (S.D. Fla. Dec. 9, 2005). Likewise, representations that produce consumer injury are material. *See FTC Policy Statement On Deception*, 103 F.T.C. 174, 183 (1984); *see also*, *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 385 (1965). In this case, hundreds of consumers have been injured by Defendants' practices.

3. <u>Defendants' Unfair "Binding Estimates"</u>

In numerous instances, the Enterprise's sales agents induced consumers to purchase Moving Services essentially through a "bait and switch" pricing program. The sales agents often provided consumers with a "low ball" price quote to induce them to enter into a service agreement relating to their move, and to pay the Enterprise a significant up-front deposit (of up to 30% of the quoted price for the move). [*See SUMF*, at ¶¶65-68]. Consumers were told the deposit was refundable if the move was cancelled within three (3) days of the scheduled pick-up. [*SUMF* at ¶68]. Once the cancellation period had expired, the Enterprise's sales agents would recontact the consumer, substantially increase the quoted price for the move (often doubling the cost), and demand that the consumer sign a "revised binding estimate" for the higher amount or lose their significant deposit. [*SUMF* at ¶¶69-71].

Clearly, such a "bait and switch" pricing program is unfair (as well as deceptive). Here, the Defendants' acts and practices caused an injury to many consumers that (1) was substantial; (2) was not outweighed by any countervailing benefits to consumers or competition that the practice produced; and (3) was an injury that consumers themselves could not reasonably have

avoided. *See Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1098 (Fla. 3d DCA 2014); *see also Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d at 1364.

The Defendants' practice of hiking the consumers price quote after the cancelation period and within days of the scheduled move caused substantial injury to consumers who must either accept the unexpected price hike (sometimes doubling the cost) or lose their substantial deposits. This injury is not outweighed by any countervailing benefits to the Enterprise's consumers; the practice forced many consumers to hire a moving company that routinely utilized unskilled, untrained and unsupervised agents who often damaged, lost or stole consumers' property.

Likewise, this injury to consumers provides no countervailing benefit to the Defendants' competitors. In fact, the Enterprise's "bait and switch" estimates actually harms its competitors, as it takes business away from other honest moving companies who provide accurate binding estimates to consumers and who do not rely upon unknown transient laborers to perform their services.

Finally, this injury to consumers is one that the consumers cannot reasonably avoid. Once a consumer is tricked into transmitting their deposit to the Enterprise, based on the artificially low "binding estimate" they received, the consumer has no way of knowing before the cancellation period runs out that their "binding estimate" will not be honored and that a substantial price hike is coming just days before their move. Moreover, once the consumer learns of the last-minute price hike, there is little they can do. At that point, many consumers have little or no reasonable or practical alternative other than to acquiesce to the unexpected price hike, given: the impending scheduled date for their move; their need to vacate the premises based on other contractual obligations; the amount of time spent packing and other preparations they had already undertaken for the move; and their desire not to forfeit the substantial deposit they have already paid to the Defendants. [*SUMF* at ¶73].

Thus, the Defendants' practice of issuing last-minute price hikes before the scheduled move is unfair under FUDTPA. *See Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1098 (Fla. 3d DCA 2014); *see also Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d at 1364. [5]

---

[5] The Defendants' routine, undisclosed practice of using subcontractors and day laborers to perform their Moving Services should be deemed an unfair practice as well as a deceptive practice under FDUTPA. Likewise, the Defendants' routine, undisclosed practice of loading and

**D. Advertising Violations Under FMSCA Regulations (Count 1)**

Section 375.207 of the FMCSA Regulations permits a household goods motor carrier to publish and use advertisements but requires that any such advertisements be "truthful, straightforward, and honest." 49 C.F.R. §375.207.[6]

As indicated above, the Corporate Defendants, while operating as household goods motor carriers, engaged in advertising (including websites and email solicitations) that was false, dishonest and misleading, including false statements regarding the Corporate Defendants concerning: the extent of their operating history [*SUMF* at ¶¶2, 4, 35-42, 58, 59]; their size and location of supposed offices [*SUMF* at ¶¶80-82]; their supposed "climate-controlled" storage facilities [SUMF at ¶¶ 46-48]; their supposed "fleet" of trucks [*SUMF* at ¶¶41-44]; the nature and extent of their employee's training, experience and expertise in the moving industry [*SUMF* at 23-27, 59]; and their supposed refusal to broker or subcontract their moves, or use day laborers or contractors on their moves [*SUMF* at ¶¶55, 59]. The uncontroverted evidence shows these false and untruthful advertisements violate Section 375.207 of the FMCSA Regulations.

VAKNIN authorized the false and misleading advertisements that were published by the Corporate Defendants' websites, [*SUMF* at ¶¶49-54] and was aware of other false email advertisements that were being utilized by the Enterprise [*SUMF* at ¶¶55-60]. Pursuant to Section 375.901 of the FMCSA Regulations the penalty provisions of 49 U.S.C. Chapter 149 apply to this part. Section 14911 of the I.T.C. further provides that: "… When acting in the scope of their employment, the actions and omissions of individuals acting for or employed by that carrier are considered to be the actions and omissions of that carrier as well as that individual."

**E. Failure to Provide Proper Written Estimates (Count 2)**

Section 14104(b)(1)(C) of the I.T.C., and Section 375.401 of the Regulations require a household goods motor carrier, before executing an order for shipment of household goods, to provide the shipper with a proper written estimate containing the total charges for the

---

then unloading and storing consumers goods until they could be reloaded and combined with the other consumers' goods on another interstate carrier's truck is similarly unfair under FDUTPA.

[6] Section 375.103 of the FMCSA Regulations defines the term "advertisement" to mean, "any communication to the public in connection with an offer or sale of any interstate household goods transportation service."

transportation and all related services that is dated and signed by the carrier's agents and the individual shipper, and copied and supplied to the individual shipper.

The uncontroverted evidence shows that the Corporate Defendants' agents provided consumers with copies of written "binding estimates" that were unsigned by the carrier's agents and often did not include the total amount for all charges for the transportation and related (accessorial) services to be provided. [*SUMF* at ¶¶67, 70-71]. Thereafter, within a day or two of the scheduled move, Enterprise sales agents would recontact the consumer, advise that the prior estimates were not accurate, and demand that a substantially higher "revised binding estimate" be signed by the consumer. [SUMF at ¶¶69-71]. VAKNIN was aware of these activities and that the Corporate Defendants paid commissions to the sales agents based on the amount that the "binding estimate" was increased.

Section 13907 of the I.T.C. provides that: "Each motor carrier providing transportation of household goods shall be responsible for all acts or omissions of any of its agents which relate to the performance of household goods transportation services (including accessorial or terminal services) and which are within the actual or apparent authority of the agent from the carrier or which are ratified by the carrier."

**F. Failure to Relinquish Goods (Count 3)**

Title 49 U.S.C. §13707(b)(3) and C.F.R. §§375.403(7) and 375.703(a) require a household goods motor carrier to relinquish possession of a shipment of household goods upon the individual shipper's offer to pay the binding estimate amount (plus charges for any additional services requested by the shipper after the bill of lading has been issued and charges, if applicable, for "impracticable operations" not to exceed 15 percent of all other charges due at delivery).

The uncontroverted evidence establishes that the Corporate Defendants have failed to relinquish possession of a shipment of household goods to an individual shipper who offered to pay the binding estimate amount plus applicable charges for additional services requested by the shipper after the bill of lading had been issued and applicable charges for "impracticable operations" totaling up to 15 percent of all other charges due at delivery. [SUMF at ¶78].

**G. Failure to Pick Up/Tender Shipment and Provide Notification (Count 4)**

Title 49 C.F.R. Part 375, Sections 375.603 and 375.605) require that a household goods motor carrier tender a shipment for delivery for an individual consumer on the agreed delivery

date or within the period specified on the bill of lading, and when unable to perform, as soon as the delay becomes apparent, the carrier must notify the individual shipper of the delay.

In numerous instances, Defendants failed to timely pick up or timely tender (deliver) a shipment of household goods on the agreed delivery date or within the period specified in the order for service and failed to promptly notify the individual shipper as soon as the delay had become apparent. [*SUMF* at ¶83]. VAKNIN received regular (daily or weekly) reports from his assistant regarding consumers who complained about these failures as well as consumers demanding refunds. [*SUMF* at ¶84].

H. **<u>Violations of the F.M.A. (*Per Se* FDUTPA Violation)</u> (Count 6)**

In numerous instances, Defendants violated various provisions of the F.M.A., including: (1) Section 507.07(3), Florida Statutes, which prohibits misrepresentations or deceptive representations concerning "(c) The price, size, nature, extent, qualities, or characteristic of accessorial or moving services offered…" [*SUMF* at ¶¶2, 4, 23-27, 35-44, 46-48, 58, 59, 80-82]; (2) Section 507.07(6)(b), Florida Statutes, by committing numerous acts of fraud, misrepresentation, or failure to disclose a material fact, as more particularly described above. [*Id*.]; and Sections 507.05(1) and (4), Florida Statutes, by failing to provide to consumers on contracts and written estimates an actual physical address where Defendants' employees are available during normal business hours, or the physical address of the location where the consumers' household goods would be stored pending further transportation. [*SUMF* at ¶¶81-82].

Such violations of the F.M.A. constitute a per se violation of FDUTPA. *See* Section 501.203(3)(c), Florida Statutes. Indeed, Section 507.08 of the F.M.A. specifically provides that: "Acts, conduct, practices, omissions, failings, misrepresentations, or nondisclosures committed in violation of [the F.M.A.] are deceptive and unfair trade practices under [FDUTPA], and administrative rules adopted in accordance with the act."

I. **<u>Violations of the I.T.C. and Regulations (*Per Se* FDUTPA Violation)</u> (Count 7)**

As discussed above, in numerous instances, Defendants violated various provisions of the I.T.C. and FMCSA Regulations, including: (a) Section 375.207 regarding false and misleading advertising (*See* Section III. D, above); (b) Section 375.401 regarding proper written estimates (*See* Section III. E, above); (c) Section 13707(b)(3) of I.T.C. and §§375.403(7) and 375.703(a) regarding release of goods (*See* Section III. F, above); (d) Sections 375.603 and 375.605

regarding failure to tender shipment and provide notification of late shipment (*See* Section III. G, above).

The I.T.C. and FMCSA Regulations were intended to promote competitive and efficient transportation services in order to, among other things, "encourage fair competition, and reasonable rates for transportation by motor carriers of property" and "meet the needs of shippers, receivers, passengers, and consumers." (*See* §13101(a)(2)(A) and (C) of the I.T.C.). Likewise, Title 49 C.F.R. Part 375 (Transportation of Household Goods in Interstate Commerce; Consumer Protection Regulations) sets forth the specific consumer protection regulations governing the transportation of household goods in interstate commerce. Accordingly, violations of these consumer protection statutes constitute a per se violation of FDUTPA. *See* Section 501.203(3)(c), Florida Statutes.

J. **VAKNIN is Individually Liable for the Violations**

Under FDUTPA, once corporate liability is established, to obtain an injunction against an individual the Florida Attorney General need only prove that an individual defendant actively participated in or had some measure of control over the corporation's acts and practices in violation of FDUTPA. *See FTC v IAB Marketing Associates*, *LP*, 746 F.3d at 1233; *KC Leisure, Inc. v. Haber*, 972 So. 2d 1069, 1073 (Fla. 5th DCA 2008); *FTC v. GEM Merchandising Corp.*, 87 F.3d at 470 (holding an individual liable under the FTC Act where he "was aware that salespeople made material representations to consumers to induce sales, and he was in a position to control the salespeople's behavior").

Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer. *Amy Travel Serv*., 875 F. 2d at 573 (citation omitted). "An individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation,'" *1st Guar. Mortgage Corp.*, 2011 WL 1233207 at *14-15, and a "'heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception.'" *FTC v. Windward Mktg., Inc., No.* CIV. A. 1:96-CV-615F, 1997 WL 33642380, at *13 (N.D. Ga. Sept. 30, 1997) (citation omitted).

Additionally, the Court may order monetary relief against individual defendants if they had or should have had knowledge or awareness of the misrepresentations. *See e.g., KC Leisure*, 972 So. 2d at 1073-1074. "To satisfy the knowledge requirement, the FTC must show that the

individual had 'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.'" *1st Guar. Mortgage Corp*., at *14-15. "'The degree of participation in business is probative of knowledge.'" *Id*.

As with corporate liability, the enforcing authority "need not demonstrate ... that the individual defendants possessed the intent to defraud." Windward Mktg., Inc., 1997 WL 33642380, at *13 (N.D. Ga. Sept. 30, 1997) (*quoting FTC v. Jordan Ashley, Inc*., 1994 WL 200775, at *3 (S.D. Fla. Apr. 5, 1994)). Rather, "[a]wareness of fraudulent practices and failure to act within one's authority to control such practices is sufficient to establish liability." *Id*. (*quoting FTC v. Atlantex Assocs*., 1987 WL 20384, at *11 (S.D. Fla. Nov. 25, 1987), aff'd, 872 F. 2d 966 (11th Cir.1989)).

Here, VAKNIN is individually liable for the actions of the Corporate Defendants, as the undisputed facts show that he: 1) possessed the authority to control and did control the Corporate Defendants' business operations as their sole officer and owner [SUMF ¶¶2, 4, 6]; and 2) directly participated in the subject acts and practices, and 3) failed to act within his authority to stop the deceptive and unfair practices. [SUMF ¶¶ 6-8, 14-20, 28, 31, 33, 36, 38, 42, 40, 45, 48-61, 64-65, 71, 76, 83]. VAKNIN, among other things, controlled the daily operations and finances of the Enterprise and set its policies [SUMF ¶7]; he contracted to have the Enterprise's deceptive websites created and he approved them for uploading and public display on the Internet [SUMF ¶¶49, 50, 53]; he also reviewed the deceptive websites both before and again after they were uploaded on the Internet and did not correct the false statement contained therein [SUMF ¶¶50, 52, 54]. Clearly, VAKNIN knew or should have known the Enterprise's deceptive advertising and unfair estimates violated FDUTPA, the I.T.C. and various FMCSA Regulations thereunder.

## IV. CONCLUSION

For all the foregoing reasons, the Florida Attorney General respectfully requests that this Court grant its motion for summary judgment as to liability against all Defendants in this case.

Dated this 24th day of January, 2020

Respectfully Submitted,

ASHLEY MOODY
ATTORNEY GENERAL

By: __ s/ Howard S. Dargan______
HOWARD S. DARGAN
SENIOR ASSISTANT ATTORNEY GENERAL
Fla. Bar No.: 0494089
email: Howard.dargan@myfloridalegal.com

__ s/ Hughens Dolisca ____
HUGHENS DOLISCA
ASSISTANT ATTORNEY GENERAL
Florida Bar # 0099744
email: Hughens.dolisca@myfloridalegal.com
Office of the Attorney General
Consumer Protection Division
1515 N. Flagler Drive, Suite 900
West Palm Beach, FL 33470
Tel: 561-837-5007 / Fax: 561-837-5109

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 24th day of January, 2020, I electronically filed the foregoing Motion for Summary Judgment with the Clerk of the Court by using the CM/ECF system. I also certify that the foregoing document is being served this date on all counsel of record or pro se parties identified on the attached Service List, via transmission of Notices of Electronic Filing generated by the CM/ECF system, or for those counsel or parties who are not authorized to receive CM/ECF Notices of Electronic Filing, in another authorized manner as specified.

/s/ Howard S. Dargan___
Howard S. Dargan, Esq.

**SERVICE LIST**

Lawrence J. Roberts, Esq.
(lroberts@lrobertsandassociates.com)
David W. Smith, Esq.
(dsmith@lorbertsandassoicates.com)
Lawrence J. Roberts & Associates, P.A.
249 Catalonia Avenue
Coral Gables, Florida 33134
Tel: (305) 441-7882 /Fax: (305) 441-7883
*Counsel for Defendants*