**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 18-25446-CIV-ALTONAGA/Goodman**

**OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS,**

**Plaintiff,**

**-vs-**

**US MOVING SERVICES INC**, et. al,

**Defendants.**

## JOINT PRETRIAL STIPULATION

The Plaintiff, OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS ("Florida Attorney General" or "Plaintiff"), and Defendants, US MOVING SERVICES INC, d/b/a Safeway Moving & Storage, Apex Moving, Number One Van Lines, Moving Services, Proud American Vanlines, Up Line Moving, Spartan Moving, Spartan Van Lines and/or Prodigy Moving & Storage ("US MOVING"), MOVING & STORAGE SF INC, f/k/a Safeway Moving & Storage Inc, d/b/a Apex Moving & Storage, Moving and Storage Inc, Upline Moving and/or Prodigy Moving & Storage ("SAFEWAY"), MOVING SYSTEMS INC, f/k/a Spartan Moving System Inc, d/b/a Spartan Van Lines ("SPARTAN"), (collectively, US MOVING, SAFEWAY and SPARTAN are referred to as "Corporate Defendants"), and YEHOSHUA VAKNIN ("VAKNIN"), individually and as owner, officer and/or principal of US MOVING, SAFEWAY and SPARTAN (collectively, VAKNIN and the Corporate Defendants are referred to as "Defendants") by and through their undersigned

counsel and pursuant to this Court's Order Setting Trial hereby submit this Joint Pretrial Stipulation and state:

## I. STATEMENT OF THE CASE

### A. Plaintiff's Statement of the Case

1. Since at least January 2014, VAKNIN has been operating one or more of the Corporate Defendants as household goods motor carriers, who were registered as such with the U.S. Department of Transportation ("USDOT"). Defendant VAKNIN originally formed US MOVING in about August 2008 and thereafter was its sole officer (president) and owner. VAKNIN also became the sole officer (president) and owner of Defendants SAFEWAY and SPARTAN in approximately May 2016 and August 2016, respectively. As sole owner and officer, VAKNIN controlled the daily operations of the Corporate Defendants and actively participated in and had knowledge of the Corporate Defendants' acts and practices.

At all times material hereto, the Corporate Defendants advertised, solicited, provided, offered, sold or distributed services relating to moving, transportation, arranging for the transportation or the physical movement and/or storage of household goods (hereinafter "Moving Services") for consumers residing in Florida and throughout the United States.

Defendant VAKNIN ran Defendants US MOVING, SAFEWAY and SPARTAN as part of a common enterprise; these Corporate Defendants shared common ownership, officers, employees, business functions, corporate systems, marketing activities, financial resources, operational assets (trucks and moving equipment) and office locations. The Corporate Defendants also operated under the same or substantially similar fictitious trade names and transferred consumers' funds between the Corporate Defendants' accounts.

The Corporate Defendants utilized social media, telemarketing, emails and numerous websites to advertise and offer their Moving Services to consumers. Defendant VAKNIN hired the web-design company that created the Corporate Defendants' websites and he was provided with copies of the draft website pages before he authorized that the websites be uploaded and made available for display to the public over the Internet. VAKNIN also reviewed at least portions of the Corporate Defendants' websites online, after they had been uploaded and were made available for public viewing.

The Corporate Defendant's websites and other advertising materials repeatedly represented to the public that the Defendants' employees and agents were highly experienced and trained, experts who would provide exceptional care during the loading, transportation and delivery of the customers' household goods. The websites claimed, for example, that the Corporate Defendants' highly skilled and knowledgeable agents knew how to:

- ***pack items properly***, including "artwork and delicate antiques;"
- "***expertly wrap*** and protect fragile items and furniture;"
- "***efficiently load*** the truck to ***maximize space*** and ***prevent damage***;"
- "***expediently transport*** and deliver [] shipment for a prompt and ***timely arrival***;" and
- "***custom wrap and crate*** any item to make sure it gets to your destination ***without a scratch***."

Another advertisement used by the Corporate Defendants falsely stated:

- We are the ACTUAL CARRIER and service our moves directly;
- We Do NOT BROKER OR SUBCONTRACT
- Our movers are our employees… NOT DAY LABORERS OR CONTRACTORS
- Our movers are required to have…. MINIMUM OF 3+ YEARS OF PROFESSIONAL WHITE GLOVE moving experience

In fact, the Corporate Defendants did not always utilize highly experienced and trained, expert movers but instead, often employed unskilled and untrained day laborers (or "helpers") that their drivers located on Craigslist or other online labor pools to conduct the Moving Services. The Defendants did not conduct any background checks on these transient laborers and often paid them in cash without even retaining copies of the individual's driver's license or other identifying information. In addition, the Corporate Defendants also regularly subcontracted their customers' moves to other interstate motor carriers who also used laborers that were not trained or supervised by the Corporate Defendants in any manner.

The Enterprise's websites and other advertisements also contained misrepresentations concerning the operational history and resources of the Corporate Defendants (and the fictitious entities (dba's) they created), including that:

- US MOVING had been "Established in 2005";
- SAFEWAY had over 25 years' experience in the moving industry;
- SAFEWAY's fictitious entity, Prodigy Moving & Storage, had been providing "expert Pro relocation services to thousands of …customers" since 2007;
- SAFEWAY's fictitious entity, Apex Moving & Storage, was "family owned & operated" for "10 years;"
- SPARTAN's fictitious entity, Spartan Van Lines, was established as a moving company in 2008
- US MOVING and SAFEWAY (dba Apex Moving & Storage) each had a "fleet of 20 trucks;"
- US MOVING owned a large "climate-controlled" facility with 10,000 square feet of available storage space; and
- Defendant SAFEWAY's dba, Prodigy Moving & Storage, had a large "climate-controlled" facilities with 20,000 to 25,000 square feet of available storage space.

In reality, none of the Corporate Defendants existed in 2005, and Defendants SAFEWAY

and SPARTAN were only created in 2016. Likewise, the Corporate Defendants did not own any such large, storage facilities, but instead rented space along with other unrelated motor carriers at public storage facilities and privately owned warehouses. Moreover, the Corporate Defendants never owned more than between two (2) to four (4) trucks at any time during their existence. As a result, the Corporate Defendants often rented commercial "box" trucks from U-Haul, Budget or Enterprise Truck Rental, and hired other interstate moving companies as subcontractors to perform Moving Services for their customers. The Defendants did not train, supervise or control the subcontractors' laborers who were providing Moving Services for the Defendants customers.

In addition, after the Corporate Defendants' employees would pick up a customer's household goods for interstate transport, those goods would routinely be off-loaded and stored in a public storage facility or warehouse until the Defendants could locate and hire another, third-party, interstate motor carrier (subcontractor) who had room on their semi-truck and was traveling to the same geographic region where the Defendants' customer was moving to. This routine practice (of loading, then unloading and storing consumers' goods until they could be reloaded and combined with another interstate carrier's shipment) was not disclosed in any of the Corporate Defendants' websites or other solicitations.

Numerous consumers nationwide have complained about the Defendants' acts and practices after experiencing substantial damage, loss and/or theft of their household goods. Thereafter, Defendant VAKNIN often directed Defendants' employees not to provide any recompense or only a *de minimis* amount of compensation to consumers whose goods were lost, stolen or damaged.

In numerous instances, consumers who responded to the Defendants' marketing efforts were directed to sales agents who spoke with the consumers over the telephone. The

Defendants' sales agents would routinely quote the consumer a very low price for the requested Moving Services, without conducting a physical survey of the goods to be transported, then solicited the consumer to enter into an agreement with the Defendants and to pay a substantial up-front deposit (often up to 30% of the quoted price).

In most instances, consumers were then given an unsigned document purporting to be the "Binding Estimate" for their move, and many were led to believe that this "binding estimate" would essentially lock-in the amount the consumer would be required to pay to complete their household move. The Consumers' were told the initial deposit was refundable if the move was cancelled at least three (3) days before the scheduled pick up date.

In numerous instances, after the consumer's cancellation period had expired, and literally within a day or two of the scheduled pickup, another sales agent would contact the consumer under the guise of providing a "quality assurance review" relating to the consumer's move. During the purported "quality assurance review," this commission-based, sales agents often told consumers that their initial binding estimate was not accurate, that it materially understated the total charges for the Moving Services to be performed, and that a new "revised binding estimate" would have to be issued, which substantially increased (sometimes doubling) the original price quoted. At that point, the consumers had no reasonable or practical alternative but to acquiesce to the unexpected price hike, given the impending scheduled date for their move, or they were forced to forfeit the substantial deposit they had already paid to Defendants.

Consumers have reported that in numerous instances, on the day of pick-up and after loading of their household goods had commenced or in some instances was completed, they were confronted with a significantly higher monetary demand than previously quoted and were required to sign a new "revised estimate" with the higher price, or else have their goods taken to

storage. VAKNIN was aware of these practices and paid the drivers a commission based on the higher amount being charged to the consumers at the time of pick up.

B. **Defendants' Statement of the Case**

Yehoshua Vaknin is a small business owner. In the early 2000s he began working for a household goods moving and storage company, first as a driver, and later in an administrative capacity. After illness befell his mentor, Mr. Vaknin worked for a few other household goods movers before opening his own company in US Moving Services, Inc., in 2008. After years of diligent work, both running the business and at times performing the moving services himself, Mr. Vaknin expanded his business by purchasing two other household goods moving companies – Safeway and Spartan[1]. Just as any business owner attempting to grow, purchasing competing companies in the market with a different customer basis is viable and certainly legal way to do so.

While some operations of the three entities were often during their existence operated from the same location, each business was at all times separate and distinct. Never was money moved between businesses in an manner in which it was not accounted for properly, and done in exchange for services. Often, just as happens throughout the household goods industry, even with the largest networks of household goods movers, one company will perform the packing and loading, another company will perform the long-haul service, and yet another will perform final delivery. This is standard in the industry. The one truck from your house to your destination model that Plaintiff imagines might have once existed is exceedingly rare, and even more exceedingly expensive. Such service is not an option for most consumers. Despite the suggestions herein, Plaintiff has no evidence of any transfers between companies that was

[1] Both Safeway, which was later renamed Moving & Storage SF, and Spartan which was later named Moving Systems, Inc., are presently defunct, having canceled their authority with the FMCSA and ceasing all operations.

improper, unaccounted for, and not done in exchange for some past, present, or future service or repayment.

US Moving, Spartan, and Safeway did all at some point in time have websites designed by third parties. However, Plaintiff's suggestion of social media and email campaigns are pure fiction, and have not been supported by a single shred of evidence in this case. Similarly, Plaintiff's suggestion that a single household goods shipper – even one of the consumers it purports to be acting on behalf of, had at any point in time prior to the provision of their moving services ever even seen any of the Defendants' websites is pure fiction. These websites were built by third party providers who solicit household goods movers all across the country and build websites for these movers. They provide all of the copy, as is clear from the identical copy utilized by them here and in other similar sites for non-parties, and simply insert references to the company name within those descriptions. There is no allegation and no evidence supporting the suggestion that any person ever viewed these websites, and then chose to hire one of the Defendant companies. As such, there's certainly no basis upon which to claim that consumers were mislead by those sites into hiring one of the Defendants.

Instead, the source of each and every move performed by Defendants' was either a household goods moving broker, a third-party sales agency, or more recently, the in-house sales departments of the Defendants. As with most fledgling moving companies, Defendants did at one point accept moves from household goods brokers, who act as shipper's agents in locating a household goods mover with the capacity to provide the requested services. The FMCSA licenses and regulates household goods brokerage services, and there is certainly nothing unethical or illegal about accepting shipments from them. However, the experience of Defendants was that brokers would often underbid shipments, and then upon arrival by the

mover, it would be discovered that the volume of goods to be moved was inaccurate. For this reason, Defendants ceased accepting loads from most brokers years ago.

Defendants then utilized an outside sales agency, and while the results were consistently better than with brokered loads, eventually, in order to ensure accurate estimates and control the sales pitches and representations, Defendants built their own sales staff. Again, all record evidence supports the assertion that the evolution of Defendants was toward more control over their processes and reduction in customer confusion and complaints. Tot hat end it must be noted that Defendant's paperwork is unchallenged by the Plaintiff – providing for a written agreement to ever single estimate revision on a move performed by any of the Defendant companies. This is the form required by federal law, and Defendants have not failed to obtain and provide copies of such revised agreements for every single move alleged to have included a change in estimate by the Plaintiff. In addition, Defendant has even gone so far as recording customer agreements to revisions on telephone calls in order to protect itself from attempts to get free moves by consumers who are less than scrupulous.

Another troubling factor of the "catch-22" prosecution taking place in this matter is that, regardless of what was done by the Defendant moving company, consumer complaints will occur, and only their content will vary. For example, of the 148 moves claimed to be substantiated by Plaintiff most recently, eight of those moves were canceled prior to goods being loaded. The reason for these cancellations is almost universally, that the mover arrives on scene, surveys goods to be moved, and the moving conditions, as compared to the Estimate, which was based upon the shipper's description of items to be moved, and the mover determines that the volume is far greater, that there are accessorials not previously mentioned like more than one flight of stairs, the need for a smaller, shuttle vehicle due to physical requirements of the

residence, or more than a fifty yard carry required from the residence. In such cases, the Defendants would, precisely following federal regulations, advise of the additional charges not included in the estimate, and present the shipper with revised estimate. On these eight moves the shipper refused, and the result then is that the mover offers to move only what is on the estimate, or advises that the shipper needs to find a new carrier. In short, a contract has not been formed, because there is no meeting of the minds.

This result, the cancellation of loads while on-site by a mover, is proof that the mover is following federal regulations in regard to advising shippers of discrepancies and offering revised estimates. The result in this case, from these interactions, of which Plaintiff found eight consumers willing to complain over a three-year period, is an allegation of wrongdoing on the part of the Defendants. For clarity refunds were issued on four of the eight cancellations, with another not appearing in the Defendant's system at all.

If Defendant perfectly follows regulations, and advises customers of the discrepancy, which results in cancellation, the OAG sues the Defendants for that act. IF the customer agrees to the revised estimate, and signs, attesting that they have "altered the circumstances surrounding my move from which I first requested the estimate," the OAG sues the Defendant for that act. Further, for every move, every consumer was provided notice that the carrier will proceed with reasonable dispatch and that delivery dates were not guaranteed unless the customer purchased that extra service. The FMCSA rights and responsibilities advisement which is provided to every shipper, states in regard to delay claims "Delay claims are processed when you have contracted with your mover for guaranteed service for pickup and delivery. Your mover will outline on the bill of lading any penalty or per diem entitlements when there is a pickup delay

and/or delivery delay." A majority of the complaints cite delay, but none include the purchase of the guaranteed delivery.

Similarly, the consumer complaints include allegations of damaged goods. However, many of these consumers never filed a claim for loss or damage within nine months of delivery, as required both by federal law and the bills of lading. For the few who did timely file claims most were offered, and many accepted (signing releases), resolution in accordance with the declared value they selected in the bill of lading, of sixty-cents per pound, the statutory minimum provided free of charge. Simply put, the largest share of complaints involve claims that the consumer's own contractual choices left them dissatisfied.

Finally, Plaintiff attempts to paint mere puffery, written, created, and published by third parties, as having some connection to the complaints of the consumers it purports to be serving with the bringing of this action, but the reality is that Plaintiff cannot and has not come forth with so much as a scintilla of evidence to create a causal nexus or even a loose connection between the alleged web site references and the complaints of consumers.

Every business receives complaints. Every business receives bad reviews on yelp or google or some other rating service. Here, the OAG has gone out and recruited any consumer who made a BBB complaint, left a bad review, or complained to any federal or state agency in the last five years to join into this action against the Defendants. In the time period covered by these various complaints, the Defendants have participated in thousands if not tens of thousands of moves. The fact that the OAG after years of investigation and recruitment, has obtained such a minute percentage of moves.

Finally, the few claims from websites, which did not lead to any consumer moves, let alone complaints, that Plaintiff seems to believe are direct and factual, instead of mere puffery,

are being taken out of context. One need not own a storage facility in order to have use of it. One need not own a vehicle, often owned by the owner-operator driver as is common in the industry, to include it in an advertised fleet. Others cited by the Plaintiff are plainly true, that the business is family owned, that the management has been satisfying shippers in the industry for decades, and that its ownership and staff have vast experience and are, by definition of earning their living in industry, professionals. Simply stated, none of the representations are actionable if they were false or if proving the falsity of them is even possible, but where as here, they are both defensible and not connected to harm, there is no public protection in prosecuting a small business.

## II. THE BASIS OF FEDERAL JURISDICTION

This Court has subject matter jurisdiction over the federal claims set forth in the Complaint pursuant to Section 14711(a) of the Interstate Transportation Code, Title 49 U.S.C., Subtitle IV, Part B ("I.T.C."), as well as supplemental jurisdiction over the state of Florida's claims pursuant to 28 U.S.C. Section 1367 and the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes ("FDUTPA").

## III. THE PLEADINGS RAISING THE ISSUES

A. Plaintiff's Amended Complaint (D.E. 58).

B. Defendants' Answer and Affirmative Defenses (D.E. 60).

## IV. UNDISPOSED OF MOTIONS REQUIRING ACTION BY THE COURT

A. Plaintiff's Motion For Summary Judgment as to Liability Against Defendants US Moving Services Inc, Moving & Storage SF Inc, Moving Systems Inc and Yehoshua Vaknin (D.E. 75).

## V. STATEMENT OF UNCONTESTED FACTS

The parties state the following facts are uncontested in this matter:

1. Defendant US MOVING was a Florida corporation registered with the USDOT as an interstate household goods motor carrier (USDOT #1833493) since on or about November 28, 2008.

2. Defendant VAKNIN formed US MOVING on or about August 6, 2008 and thereafter was its only officer (president) and owner.

3. Defendant MOVING SAFEWAY was a Florida corporation formed in June 2015 and registered with USDOT as an interstate household goods motor carrier (USDOT # 2780116) on or about July 8, 2015.

4. VAKNIN became the sole officer (president) and owner of SAFEWAY by at least on or about May 11, 2016.

5. Defendant SPARTAN was a Florida corporation formed in March 2016 and registered with the USDOT as an interstate household goods motor carrier (USDOT #2093720) since at least April 25, 2016.

6. VAKNIN became the sole officer (president) and owner of SPARTAN by at least on or about August 30, 2016.

7. VAKNIN actively participated in the daily operations of the Corporate Defendants.

8. VAKNIN exercised control over the Corporate Defendants' bank accounts.

9. VAKNIN set company policies for the Corporate Defendants.

10. During all time material hereto, the Defendants engaged in trade or commerce by advertising, soliciting, providing, offering, selling or distributing services relating to moving, transportation, arranging for the transportation or the physical movement and/or storage of household goods (hereinafter "Moving Services") for consumers residing in Florida and throughout the United States.

11. At all times material hereto, the Defendants acted as either interstate household goods motor carriers or intrastate movers, and in the ordinary course of providing transportation of household goods for compensation, the Defendants offered some or all of the following additional services: (1) binding and nonbinding estimates; (2) inventorying; (3) protective packing and unpacking of individual items at personal residences; (4) loading and unloading at personal residences.

12. VAKNIN registered the fictitious name "Safeway Moving & Storage" from about May 2016 until at least July 2017 to US MOVING and SAFEWAY.

13. VAKNIN registered the fictitious names "Apex Moving" and "Apex Moving & Storage," after about May 2017 to US MOVING and SAFEWAY, respectively.

14. VAKNIN used the fictitious names "Spartan Moving" and "Spartan Van Lines" for US MOVING in August 2016 and January 2018, respectively, while also using the fictitious names "Spartan Moving System Inc" and "Spartan Van Lines" for SAFEWAY.

15. VAKNIN filed registrations with the Florida Department of State ("FDOS") on January 5, 2018 on behalf of both US MOVING and SAFEWAY for use of the fictitious names "Up Line Moving" and "Upline Moving."

16. VAKNIN registered with FDOS on September 7, 2018, on behalf of both US MOVING and SAFEWAY, the fictitious name, "Prodigy Moving & Storage."

17. Defendant US MOVING caused a website to be created at www.usmovingsvc.com.

18. The website for US MOVING (www.usmovingsvc.com) represented that the company offered a variety of "professional moving services" performed by their "skilled and knowledgeable staff" who were "trained to know how to pack items properly" and had "the skills to take care of [consumers'] delicate items," including "artwork or delicate antiques."

19. Defendant SAFEWAY maintained a website at www.safewaymovingandstorage.net where its Moving Services were advertised and offered for sale.

20. The website for SAFEWAY (www.safewaymovingandstorage.net) represented that: "Our experience[d] moving crew has the training and the know-how to expertly wrap and protect fragile items and furniture, efficiently load the truck to maximize space and prevent damage, and expediently transport and deliver your shipment for a prompt and timely arrival…," and "…can custom wrap and crate any item to make sure it gets to your destination without a scratch."

21. Defendant SAFEWAY caused a website to be created at www.apexmovingandstorage.info.

22. The website for SAFEWAY's dba, Apex Moving & Storage, (www.apexmovingandstorage.info) represented that the company could and would "efficiently and expediently pack and ship [the consumers'] personal effects without damage or loss – no matter the distance!"

23. Defendant SPARTAN caused two websites to be created at www.spartanmovingsystem.com and www.spartanvanline.com.

24. SPARTAN's websites at www.spartanmovingsystem.com and www.spartanvanline.com both represented that: the company had a "professional and experienced staff" that would "carefully load your belongings," "efficiently load the truck to prevent damage to your items during the long trip" and "deliver your shipment expediently…" to the consumer's new home.

25. The Corporate Defendants did not conduct background checks on every single one of the laborers (or helpers) that were being hired.

26. VAKNIN authorized the Corporate Defendants' customer service managers to offer small refunds or other credits of about $50 to $75 to consumers who complained about the price or quality of services rendered in connection with their move.

27. VAKNIN was typically made aware by the Corporate Defendants' customer service manager when a consumer demanded a refund in excess of about $75.

28. SAFEWAY's website at www.safewaymovingandstorage.net represented that the company "is a family owned and operated company located in Orlando, Florida with over 25 years' experience in the moving industry."

29. SAFEWAY was not registered with FDOS to conduct business in Florida until on or about June 25, 2015.

30. VAKNIN acquired ownership of SAFEWAY for approximately $2,000 in early 2016.

31. VAKNIN managed some operations of SAFEWAY from the Corporate Defendants' offices in Hallandale Beach, Florida.

32. The website for SAFEWAY's dba, Prodigy Moving & Storage (www.prodigymoverschatnow.com) stated that "Since 2007, our family owned company has been providing expert Pro relocation services to thousands of real and awesome customers from all over the country. For more than 12 years, we have Served proudly the US market with our Top niche moving services." (sic)

33. The website for SAFEWAY's dba, Prodigy Moving & Storage (www.prodigymoverschatnow.com) included the quoted text "expert wrapping and moving skills"

34. SPARTAN's two websites, www.spartanmovingsystem.com and www.spartanvanline.com stated the company was a "family owned business" that was "established in 2008."

35. The Articles of Incorporation for SPARTAN were filed with FDOS in or about March 2016.

36. VAKNIN did not obtain control of SPARTAN until in or about August 2016.

37. US MOVING's website at www.usmovingsvc.com stated that the company was "[e]stablished in 2005" and had "over 20 trucks in their fleet."

38. US MOVING was not registered as a motor carrier with the USDOT until on or about November 28, 2008.

39. US MOVING only owned from one (1) to four (4) trucks at any time since 2008.

40. US MOVING only owned one (1) semi-truck at any specific time since 2008.

41. SAFEWAY has never owned any trucks at any time while VAKNIN has owned or controlled the company.

42. SPARTAN has never owned any trucks at any time while VAKNIN has owned or controlled the company.

43. The website (www.apexmovingandstorage.info), stated that the company was established in 2005 and had "a fleet of 20 trucks."

44. US MOVING's website at www.usmovingsvc.com represented that the company owned a 10,000 square foot, "climate-controlled" facility for storing clients' household goods.

45. US MOVING did not own a "climate-controlled" storage facility of any size.

46. The website for US MOVING's d/b/a, Apex Moving (www.apexmoving.org) represented that the company owned a 10,000 square foot, "climate-controlled" facility for storing clients' household goods.

47. Apex Moving did not own a "climate-controlled" storage facility of any size.

48. VAKNIN knew that none of the Corporate Defendants (or their dba's) owned any warehouse facility (climate controlled or otherwise) for storing consumers goods, but instead rented space along with other unrelated motor carriers at public storage facilities and privately owned warehouses.

49. VAKNIN hired the individual or entity that designed the websites , including:

   a. www.usmovingsvc.com,
   b. www.apexmoving.org
   c. www.safewaymovingandstorage.net,
   d. www.apexmovingandstorage.info,
   e. www.prodigymoverschatnow.com
   f. www.spartanmovingsystem.com
   g. www.spartanvanline.com

50. VAKNIN provided some company specific information to the web-design company that was hired.

51. VAKNIN was aware that the Corporate Defendants also used several form emails, as “templates,” to advertise their Moving Services to consumers.

52. The form emails (templates) were generated through the Corporate Defendants’ shared computer system.

53. One such form email (template) that was used to advertise Moving Services to consumers was entitled, “Why should you use Apex Moving and Storage” (the “*Why Use* template”).

54. The *Why Use* template for SAFEWAY’s dba, Apex Moving and Storage, in about June 2017, stated that:

    a. The company was “5 STAR - A RATED – 10 YEARS – FAMILY OWNED & OPERATED”;

    b. The company’s website was at “www.apexmovingandstorage.info”;

    c. “We are the ACTUAL CARRIER and service our moves directly”;

    d. “We Do NOT BROKER OR SUBCONTRACT”;

    e. “Our movers are our employees… NOT DAY LABORERS OR CONTRACTORS”;

    f. Our movers are required to have…. MINIMUM OF 3+ YEARS OF PROFESSIONAL WHITE GLOVE moving experience”;

    g. “Our pricing is truly all inclusive and offer you both… BINDING & GUARANTEED RATES”

55. In numerous instances, the Corporate Defendants’ contracts and written estimates provided to consumers disclosed addresses, including:

    a. 3525 Piedmont Rd., 3rd Floor, Atlanta, GA 30305;
    b. 100 South 4th St, Ste 550, St. Louis, Mo 63102;
    c. 232 Market Street, Flowood, Mississippi 39232;
    d. 196 W Ashland Street, Doylestown, PA 18901;
    e. 250 E. Wisconsin Ave, #1800, Milwaukee, WI; and
    f. 1801 E Colonial Dr. #214, Orlando, FL 32803

## VI. STATEMENT OF ISSUES OF FACT WHICH REMAIN TO BE LITIGATED

**Plaintiff Preliminary Statement**:

As set forth in Plaintiff's Motion for Summary Judgment, which is pending before the Court, Plaintiff submits that there are presently no genuine issues of material fact in dispute. None of the parties hereto waive the right to challenge the relevancy of any fact contained on this list, or consent to litigate factual issues that were not properly identified in the operative pleadings. The following are facts which Defendants refuse to agree to at this time:

1. VAKNIN was often made aware of consumer complaints regarding the Corporate Defendants' acts and practices, and authorized or denied consumer refunds as he saw fit.

2. In or about May 2016, VAKNIN began simultaneously operating US MOVING and SAFEWAY.

3. In or about August 2016, VAKNIN began simultaneously operating US MOVING, SAFEWAY and SPARTAN.

4. After about August 2016, Corporate Defendants US MOVING, SAFEWAY and SPARTAN:

    a. shared common ownership, officers, employees, and office locations;

    b. offered the same purported Moving Services to consumers;

    c. transferred funds amongst the Corporate Defendants' accounts;

    d. shared financial and operational resources;

    e. shared computer and accounting systems;

    f. shared telephones, email extensions, and mailing addresses;

    g. shared customer service, sales and accounting personnel;

    h. shared assets, including trucks and moving equipment, and drivers;

    i. shared advertising and marketing methods and materials.

5. Since at least August 2016, VAKNIN operated the Corporate Defendants under the same or substantially similar fictitious trade names.

6. VAKNIN established one or more bank accounts for US MOVING that were listed under the name of the corporation along with its various overlapping fictitious trade names.

7. In numerous instances, the Corporate Defendants provided a customer with a binding estimate under one of the Corporate Defendant's name and USDOT number, and then utilized a different Corporate Defendant (with a different USDOT number but similar fictitious name) to conduct the move, provide a revised written estimate and/or deposit the consumer's funds into its own bank account.

8. The Corporate Defendants utilized the same means to advertise and offer Moving Services to consumers, including, social media, telemarketing, email and numerous websites.

9. The Corporate Defendants' websites generally promised consumers (expressly and by implication) to provide honest, reliable and professional Moving Services.

10. The Corporate Defendants' websites represented (expressly and by implication) that their employees and agents were highly experienced and trained, experts who would provide exceptional care for the consumers' household goods during their move.

11. The Corporate Defendants did not always utilize "highly experienced and trained, expert movers" but instead, regularly employed unskilled and untrained day laborers (or "helpers") to conduct the moves.

12. VAKNIN knew that these laborers (or helpers) were being located and hired by the Corporate Defendants' drivers using ads placed on "Craigslist" or through other labor pools.

13. The Corporate Defendants' drivers often paid the laborers (or helpers) in cash without even retaining copies of the employees' driver's license or other forms of identification.

14. The Corporate Defendants regularly hired other interstate moving companies as subcontractors to perform Moving Services for their customers.

15. VAKNIN authorized the Corporate Defendants to hire subcontractors to perform Moving Services for their customers.

16. The Corporate Defendants did not interview, identify, trained or supervise the subcontractors' employees who were performing Moving Services for the Corporate Defendants' customers.

17. The Corporate Defendants' employees and/or agents often delivered the consumers' household goods in a completely broken or severely damaged condition, or with various items missing.

18. The Corporate Defendants often provided either no recompense or only a de minimis amount of compensation to consumers whose goods were lost, stolen or damaged.

19. The Corporate Defendants' websites also contained certain representations regarding the operating history and operating resources of the respective companies.

20. SAFEWAY had little or no actual operations before VAKNIN acquired the company in early 2016.

21. VAKNIN knew that SAFEWAYS's dba, Prodigy Moving & Storage, was not created, and had no operating history, until about September 2018.

22. SAFEWAY's dba, Apex Moving & Storage, was created in about April 2017 and owned zero trucks.

23. The Corporate Defendants did not own a sufficient quantity of trucks to perform the Moving Services they sold to consumers.

24. The Corporate Defendants often rented small ("box") trucks from U-Haul, Penske, Enterprise or Budget truck rental in connection with performing Moving Services for their customers.

25. SAFEWAY's website at www.safewaymovingandstorage.net represented that the companies had a 20,000 square foot "climate-controlled" facility for storing clients' household goods.

26. SAFEWAY did not own a "climate-controlled" storage facility of any size.

27. The website for Defendant SAFEWAY's d/b/a, Prodigy Moving & Storage (www.prodigymoverschatnow.com), represented that the company had a 25,000 square foot "climate-controlled" facility for storing clients' household goods.

28. Prodigy Moving & Storage did not own a "climate-controlled" storage facility of any size.

29. VAKNIN was responsible for the creation and public display of all websites used by the Corporate Defendants and their dba's to advertise and offer Moving Services to the public.

30. VAKNIN received copies of the Corporate Defendants' draft website pages to review from the web-design company before the respective websites were uploaded and became available for display to the public over the Internet.

31. VAKNIN reviewed at least portions of the Corporate Defendants' draft website pages from the web-design company and made some changes before the websites were uploaded and became available for display to the public over the Internet.

32. VAKNIN authorized the Corporate Defendants' website pages to be uploaded and displayed to the public over the Internet.

33. VAKNIN also reviewed the Corporate Defendants' websites online, after they had been uploaded and became available for display to the public over the Internet.

34. The website address for the Corporate Defendants or their dba's was included in various communications with consumers, including on emails and binding estimates that were sent to prospective customers.

35. VAKNIN was familiar with the Why Use template that the Corporate Defendants, including SAFEWAY, dba Apex Moving & Storage, used to solicit consumers in about June 2017.

36. The Why Use template prominently displayed to the consumer the website address for the respective Corporate Defendant (or dba) that was being advertised.

37. VAKNIN knew the Corporate Defendants often hired day laborers in connection with their moves, and engaged numerous interstate moving companies as subcontractors to perform Moving Services for the Defendants' customers.

38. The Corporate Defendants' drivers would routinely pick up a customer's household goods for interstate transportation, then off-load and store those goods until another, third-party, interstate motor carrier could be located and hired as a subcontractor to perform the Moving Services that the Corporate Defendants had originally been hired to perform.

39. The Corporate Defendants' routine practice of loading, then unloading and storing a consumer's goods until they could be reloaded and combined with another interstate carrier's shipment, was not disclosed in the Corporate Defendants' websites or other advertisement or solicitations.

40. The Corporate Defendants' sales agents typically provided consumers with an oral estimate of the price for their Moving Services over the telephone, without conducting a physical survey of the goods to be transported.

41. After providing an oral price quote to consumers, Defendants' sales agents then solicit the consumer to sign a "binding estimate" and provide the Defendants with a substantial initial deposit for their Moving Services.

42. Consumers who signed the Corporate Defendants' Binding Estimate were not provided with a counter-signed copy of the agreement.

43. Consumers who signed the Corporate Defendants' Binding Estimate were required to transmit a substantial deposit for their move (typically up to about 30% of the estimate).

44. Many consumers who signed the Corporate Defendants' Binding Estimate were told their initial deposit would be refundable if they cancelled the move within three (3) days of the scheduled move.

45. After the consumer's cancellation period has expired, the Corporate Defendants routinely caused a second sales agent to recontact the consumer for the purpose of reviewing the quote contained in the consumer's original Binding Estimate.

46. Consumers are told they are being re-contacted as part of a "Quality Assurance Review."

47. During the purported "Quality Assurance Review," the Defendants' sales agents often told consumers that their initial binding estimate was not accurate and materially understated the total charges for their move.

48. The Defendants' "quality assurance" agents often told the consumer that a new "revised binding estimate" would have to be issued, which substantially increased (sometimes doubling) the original price quoted for their move.

49. The Defendants' "Quality Assurance" agents were actually sales personnel who were paid on commission based on the amount by which the consumer's original "binding estimate" was increased during their "quality assurance review."

50. Consumers who refused to pay the higher amount quoted on the "revised binding estimate" after their "quality assurance review" were required to cancel their scheduled move and forfeit the substantial deposit they had already paid to the Defendants.

51. VAKNIN was aware of the Corporate Defendants' practice of conducting "quality assurance reviews" after the consumers' cancellation period had expired.

52. VAKNIN was aware that the "quality assurance reviews" were being conducted by the company's commission-based sales agents.

53. In numerous instances, on the date of their scheduled move, consumers were confronted with a significantly higher monetary demand than previously quoted on their "binding estimate."

54. In numerous instances, on the date of their scheduled move, consumers were required to sign a new "revised estimate" with the higher price to complete the move.

55. Consumers who initially refused to sign the higher "revised estimate" on the day of their move were told that their household goods would be taken from them and held at an undisclosed storage location.

56. VAKNIN, or his assistant, was generally notified by the driver when a consumer refused to sign a revised binding estimate or otherwise pay the higher amount being demanded at the time of the move.

57. The Corporate Defendants' drivers were authorized to increase the price previously quoted to a consumer on a binding estimate for their move at the time of pickup, without first seeking any additional approval from VAKNIN.

58. The Corporate Defendants' drivers were not authorized to reduce the price previously quoted to a consumer on a binding estimate for their move at the time of pickup, without first obtaining specific approval from VAKNIN.

59. VAKNIN was aware that the Corporate Defendants' "pick-up" drivers were paid a commission based on the total amount that was charged to the consumer at the time the consumers' household goods were loaded.

60. VAKNIN was aware that the Corporate Defendants' delivery drivers were not being paid on a commission basis.

61. In some instances, the Corporate Defendants' agents refused to relinquish possession of the consumer's goods at the time of delivery, despite tender of the binding estimate amount and other statutorily required charges.

62. Several websites used by US MOVING and SAFEWAY to advertise Moving Services do not disclose the entities' assigned DOT number(s), including .

    a. www.usmovingsvc.com,
    b. www.apexmoving.org
    c. www.safewaymovingandstorage.net,
    d. www.Safewaymovingandstorage.blogspot

63. The Corporate Defendants' websites and other advertisements failed to disclose the physical location of their actual operations.

64. In numerous instances, the Corporate Defendants' contracts and written estimates provided to consumers do not contain an actual physical address where their employees are available during normal business hours.

65. In numerous instances, the Corporate Defendants' contracts and written estimates provided to consumers do not contain the physical address of the location where the consumers' household goods would be stored pending further transportation.

66. In numerous instances, the Defendants' agents arrived late to pick up a consumer's goods or delivered those goods well beyond the promised delivery dates/ranges, without providing the consumers with reasonable notice of the delays.

67. In numerous instances, the Defendants' agents arrived late to pick up a consumer's goods or delivered those goods well beyond the promised delivery dates/ranges, without providing the consumers with reasonable recompense.

68. VAKNIN received regular (daily or weekly) reports from his assistant regarding consumers who complained about delivery failures as well as consumers demanding refunds.

**Defendant's Preliminary Statement**:

All allegations of Plaintiff's complaint not specifically admitted in Defendant's Answer and Affirmative defenses, and not specifically admitted in the prior section, remain to be litigated. The following are facts which Plaintiff refuses to agree to at this time:

1. VAKNIN was often made aware of consumer complaints regarding the Corporate Defendants' acts and practices, and authorized or denied consumer refunds, in accordance with contracts and federal law.

2. Every shipper who paid an amount different than their original binding estimate did execute a revised estimate acknowledging a change in the volume of goods to be moved or accessorial charges for special items or additional services.

3. Every shipper was provided with the FMCSA rights and responsibilities documentation, as well additional advice as to its rights under the law in regard to bills of lading, declared values, revised estimates, and delivery times and windows.

4. None of the Defendants ever represented to any customer that their goods would be transported by directed dedicated truck service.

5. Every shipper who filed a claim for loss or damage within nine months of delivery had their claim adjusted in accordance with 49 CFR Chapter 370.

6. Every shipper who filed a claim for loss and damage within nine months of delivery, and substantiated their damages as required by federal regulations was offered a settlement commensurate with the released value that they had selected on their bill of lading, which nearly universally was $.60 per pound per article.

7. Defendants, on multiple occasions provided refunds, discounts, and settlements to shippers far beyond the contractual and regulatory requirements.

8. Each of the shippers that Plaintiff has listed as a complainant was provided notice of its rights to arbitrate or litigate the matter directly and each chose not to do so.

9. Each and every shipper did received and execute their estimate for service, revised estimate if one was issued, bill of lading, and delivery receipt thereby demonstrating clear and undeniable agreement to the terms of carriage.

10. Not one of the consumers listed in Plaintiff's complaint or discovery has provided any evidence or documentation that they contracted and paid for delivery on a date certain.

11. Each shipment moved by any of the Defendants was transported with reasonable dispatch.

12. Vaknin personally never offered or sold household goods moving service spersonally.

13. All of Vaknin's acts in regard to the sale or provision of any household goods moving services were done solely through the corporations for which he served as an officer or director and only via those roles.

14. Mr. Vaknin never made any representations or took any actions in regard to any moving services other than in his role as an officer or director of a corporation.

15. Each of the corporate defendants have, at all times relevant, maintained proper records, and maintained the corporate form, without fail.

16. Each of the corporate defendants has been at all times material, adequately and independent captilized.

17. Funds have never been informally removed from the corporation for personal rather than corporate purposes.

18. Each of the defendant corporations dealt with one another at arms-length.

19. Each of the defendant corporations have at all times material been treated as independent profit centers.

20. None of the defendant corporations have information intercorporate loan transactions.

21. Each of the defendant corporations has filed independent and complete tax returns for every year that they have been owned or operated by or through Mr. Vaknin.

22. The purchase or formation of each of the defendant corporations was for the express purpose of obtaining new and different customer bases and to provide different types or areas of service.

## VII. <u>ISSUES OF LAW ON WHICH THERE IS AGREEMENT</u>

The parties agree on the following issues of law:

1. The Court has subject matter jurisdiction pursuant to Section 14711(a) of the I.T.C., as well as supplemental jurisdiction over the state of Florida's claims pursuant to 28 U.S.C. Section 1367 and FDUTPA.

2. Venue is proper in this judicial district under Section 14711(e) of the I.T.C.

3. The Plaintiff has standing to bring a civil action on behalf of the residents of the State of Florida seeking civil penalties pursuant to Section 14711 of the I.T.C.

4. The Plaintiff is an "enforcing authority" of FDUTPA and is authorized to bring this action and to seek injunctive relief and all other available equitable or statutory relief.

5. Section 375.605 provides that, when a motor carrier is unable to perform either the pickup or delivery of a shipment on the dates or during the periods specified in the order for service, as soon as the delay becomes apparent, the carrier must notify the individual shipper of the delay, at the carrier's expense, and advise the individual shipper of the dates or periods when the carrier expects to be able to pick up and/or deliver the shipment, in one of the following six ways: (1) By telephone; (2) In person; (3) Fax transmission; (4) E-mail; (5) Overnight courier; or (6) Certified mail, receipt requested.

6. Under FDUTPA, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

7. The I.T.C. and FMCSA Regulations were intended to promote competitive and efficient transportation services in order to, among other things, "encourage fair competition, and reasonable rates for transportation by motor carriers of property" and "meet the needs of shippers, receivers, passengers, and consumers." Likewise, Title 49 C.F.R. Part 375 (Transportation of Household Goods in Interstate Commerce; Consumer Protection Regulations) sets forth the specific consumer protection regulations governing the transportation of household goods in interstate

commerce.

8. The FMCSA regulations and rules were created expressly to protect motor carriers as the literal engine of the economy, so as to "encourage fair competition, and reasonable rates for transportation by motor carriers of property" and "meet the needs of shippers, receivers, passengers, and consumers."

**VIII. <u>ISSUES OF LAW WHICH REMAIN FOR DETERMINATION BY THE COURT</u>**

**<u>Preliminary Statement</u>**:

None of the parties hereto waive the right to challenge the relevancy of any legal issue contained on this list, or consent to litigate legal issues that were not properly identified in the operative pleadings.

Plaintiff contends the following issues of law remain for determination by the Court:

1. Whether the facts are sufficient as a matter of law to establish that VAKNIN had some measure of control over any of the Corporate Defendants' unfair and/or deceptive acts and practices at any time from in or about January 2014 to in or about December 2019.

2. Whether the facts are sufficient as a matter of law to establish that VAKNIN actively participated in any of Corporate Defendants' unfair and/or deceptive acts and practices at any time from in or about January 2014 to in or about December 2019.

3. Whether the facts are sufficient as a matter of law to establish that VAKNIN had the authority to control the Corporate Defendants' unfair and/or deceptive acts and practices at any time from in or about January 2014 to in or about December 2019.

4. Whether the facts are sufficient as a matter of law to establish that VAKNIN was

aware of the Corporate Defendants' unfair and/or deceptive acts and practices at any time from in or about January 2014 to in or about December 2019.

5. Whether the facts are sufficient as a matter of law to establish that VAKNIN knew or should have known of the Corporate Defendants' deceptive acts and practices at any time from in or about January 2014 to in or about December 2019.

6. Whether the facts are sufficient as a matter of law to establish that the Corporate Defendants operated as part of a "common enterprise."

7. Whether the facts are sufficient as a matter of law to establish that the Corporate Defendants' website advertisements were deceptive.

8. Whether the facts are sufficient as a matter of law to establish that the Corporate Defendants' email advertisements through the *Why Use* template, were deceptive.

9. Whether the facts are sufficient as a matter of law to establish that the "net impression" created by the Corporate Defendants' website advertisements had the capacity or tendency to mislead consumers.

10. Whether the facts are sufficient as a matter of law to establish that the "net impression" created by the Corporate Defendants' email advertisements through the *Why Use* template, had the capacity or tendency to mislead consumers.

11. Whether the facts are sufficient as a matter of law to establish that the Corporate Defendants' practice of substantially increasing the amount of a consumer's "Binding Estimate" within days of a scheduled move and after the consumers cancellation period had expired constitutes an unfair or deceptive act of practice.

12. Whether the facts are sufficient as a matter of law to establish that the Corporate Defendants advertisements were not truthful, straightforward, and honest.

13. Whether Section 501.207(1)(b) of FDUTPA authorizes the Plaintiff to bring an action to "enjoin any person who has violated, is violating, or is otherwise likely to violate" FDUTPA.

14. Whether the elements to establish an advertising violation under Title 49 C.F.R. Section 375.207 (Count 1) are: (1) the Defendant is a household goods motor carrier; (2) the Defendant published or used an advertisement; and (3) the advertisement was not truthful, straightforward or honest.

15. Whether the elements to establish a claim for improper written estimates under Title 49 U.S.C. Section 14104(b) and 49 C.F.R. Section 375.401 (Count 2) are: (1) the Defendant is a household goods motor carrier; (2) the Defendant executed an order for service for a shipment of household goods for an individual shipper; and (3) the Defendant failed to provide the shipper with a proper, written estimate in compliance with Section 14104(b)(1)(C) of the I.T.C., and Section 375.401 of the Regulations.

16. Whether Section 14104(b)(1)(C) of the I.T.C., and Section 375.401 of the Regulations require, among other things, that the written estimate: (1) include the total amount for all charges for the transportation and related (accessorial) services to be provided; (2) be made in a writing that was dated, signed by the Defendants' agents and the individual shipper, and copied and supplied to the individual shipper; (3) specify the form of payment that will be honored at delivery; and (4) not be amended after loading of the shipment.

17. Whether the elements to establish a claim for failure to relinquish goods under Title 49 U.S.C. Section 13707(b)(3) and 49 C.F.R. Section 375.403(7) and 375.703(a) (Count 3) are: (1) the Defendant is a household goods motor carrier; (2) the Defendant provided an

individual shipper with a "binding" written estimate pursuant to Section 14104(b)(1)(C) of the I.T.C. and Section 375.401(b) of the Regulations; and (3) the Defendant failed to relinquish possession of a shipment of household goods upon the individual shipper's offer to pay the binding estimate amount (plus charges for any additional services requested by the shipper after the bill of lading has been issued and charges, if applicable, for "impracticable operations" not to exceed 15 percent of all other charges due at delivery).

18. Whether the elements to establish a claim for failure to pick up or tender a shipment and provide notification under Title 49 C.F.R. Section 375.603 and 375.605 (Count 4) are: (1) the Defendant is a household goods motor carrier; (2) the Defendant was unable to perform either the pickup or delivery of a shipment on the dates or during the periods specified in the order for service; and (3) the Defendant failed to promptly notify the individual shipper as soon as the delay had become apparent, and/or advise the individual shipper of the dates or periods when they expected to be able to pick up or deliver the shipment by any of the means set forth in Section 375.605.

19. Whether a court may find a violation of FDUTPA if the conduct in question is either: (1) unfair or deceptive (Count 5), or (2) proscribed by existing standards, rules, or statutes and is therefore a "per se" FDUTPA violation (Counts 6 and 7).

20. Whether the elements of a deceptive act or practice claim under FDUTPA are: (1) the Defendant was engaged in trade or commerce; and (2) the Defendant made a representation or omission, or engaged in an act or practice that is likely to mislead a consumer acting reasonably in the same circumstances.

21. Whether a representation is likely to mislead if it has the capacity or tendency to deceive,

and may include a claim that is false, a claim that lacks a reasonable basis, or a claim that, while literally true, creates a "net impression" that is deceptive. A representation is material if it is of a kind usually relied upon by a reasonably prudent person. Express claims are presumed material and consumer action based on express statements is presumptively reasonable.

22. Whether the elements of an unfair act or practice claim under FDUTPA are: (1) the Defendant was engaged in trade or commerce; and (2) the Defendant engaged in an act or practice that was likely to create an injury to the consumer that is: (a) substantial; (b) not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (c) one that consumers themselves could not reasonably have avoided.

23. Whether under FDUTPA, the Florida Attorney General is not required to prove that the unfair or deceptive act or practice actually caused any monetary damages, nor must it name each allegedly affected consumer or prove reliance; a practice may be deceptive without any showing of intent to deceive, and it may be found unfair to consumers without a showing that the offending party intended to cause consumer injury.

24. Whether once corporate liability is established, to obtain an injunction against an individual the Florida Attorney General need only prove that an individual defendant actively participated in or had some measure of control over the corporation's acts and practices in violation of FDUTPA. Authority to control a company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer, which gives rise to a presumption of ability to control a small, closely-held corporation.

25. Whether the elements to establish a claim for a per se FDUTPA (Counts 6 and 7) are: (1)

the existence of a law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices; and (2) a violation by the Defendant of any such law, statute, rule, regulation or ordinance.

26. Whethere the Florida Household Moving Services Act, Chapter 507, Sections 507.01-507.13, Florida Statutes ("F.M.A."), proscribes deceptive and unfair trade practices in connection with intrastate household moves. Section 507.08 of the F.M.A. specifically provides "Acts, conduct, practices, omissions, failings, misrepresentations, or nondisclosures committed in violation of [the F.M.A.] are deceptive and unfair trade practices under [FDUTPA], and administrative rules adopted in accordance with the act."

27. Whether the elements of a violation of Section 507.07(3) of the F.M.A. are: (1) the Defendant was a "mover" or "moving broker"; and (2) the Defendant misrepresented or deceptively represented: (a) The contract for services, bill of lading, or inventory of household goods for the move estimated; (b) The timeframe or schedule for delivery or storage of the household good estimated; (c) The price, size, nature, extent, qualities, or characteristic of accessorial or moving services offered; (d) The nature or extent of other goods, services, or amenities offered; or (e) A shipper's rights, privileged, or benefits.

28. Whether the elements of a violation of Section 507.07(4) of the F.M.A. are: (1) the Defendant was a "mover" or "moving broker"; and (2) the Defendant failed to honor and comply with all provisions of the contract for services or bill of lading regarding the purchaser's rights, benefits, and privileges thereunder.

29. Whether the elements of a violation of Section 507.07(5) of the F.M.A. are: (1) the Defendant was a "mover" or "moving broker"; and (2) the Defendant withheld delivery of household goods or otherwise held goods in storage against the express wishes of the

consumer notwithstanding that payment had been made by the consumer as delineated in the estimate or contract for services.

30. Whether the elements of a violation of Section 507.07(6)(d) of the F.M.A. are: (1) the Defendant was a "mover" or "moving broker"; and (2) the Defendant committed other acts of fraud, misrepresentation, or failure to disclose a material fact.

Defendants contends the following issues of law remain for determination by the Court:

1. Whether the F.M.A. is irrelevant to interstate moving services.
2. Whether the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. 14706 preempts state law claims arising from failures in the transportation and delivery of goods.
3. Whether in adopting the Carmack Amendment, Congress intended to impose a single uniform federal rule upon the obligations of carriers operating in interstate commerce. Such statutory provisions supersede 'the diverse requirements of state legislation and decisions', and render invalid all 'agreement(s) in derogation of them.
4. Whether all actions against a common carrier, whether designated as tort or contract actions, are governed by the federal statute.
5. Whether an alleged misrepresentation is an actionable statement of fact or mere puffery is a matter of law. Specific, quantifiable 'statements of fact' that refer to a product's absolute characteristics may constitute false advertising, while general, subjective, unverifiable claims are 'mere puffery' that cannot.
6. Whether it is general, subjective, or unverifiable whether someone is professional, an expert, or highly trained. These are not specific or quantifiable terms.

7. Whether the use of the claims of "complete", "highly qualified", "the best possible care", "best in the world", "excellent care of the highest quality at an affordable cost", "low cost experts", "outstanding quality, reliability, and performance", "the right", and the "the best" are not actionable because they are mere puffery.
8. Whether merely controlling the acts and practices of a corporation cannot give rise to personal liability of the principal or owner of a corporation.
9. Whether in order to establish personal liability against an individual principal based upon the acts or practices of the corporation one must demonstrate that the corporation was, in fact, both the mere instrumentality or alter ego of the individual, and that the individual intentionally engaged in improper conduct.

**IX. <u>LIST OF TRIAL EXHIBITS</u>**

The parties will meet and prepare Exhibit Notebook in accordance with this Court's Order Providing Instructions For Bench Trial.

**X. <u>LIST OF TRIAL WITNESSES</u>**

The parties shall exchange and file its Witness List in accordance with this Court's Order Providing Instructions For Bench Trial.

**XI. <u>ESTIMATED TRIAL TIME</u>**

The parties estimate that trial will last 10 days.

**XII. <u>ESTIMATED MAXIMUM ATTORNEY'S FEES ALLOWABLE</u>**

Plaintiff estimates it shall seek fees of approximately $500,000. Plaintiff objects to Defendants' fee suggestion as FDUTPA does not allow the awarding of such fees in an action initiated by the Enforcing Authority unless the Court finds that there was a complete absence of a justiciable issue of either law or fact raised by the losing party. Section 501.2105(5).

Defendant objects to Plaintiff's fee suggestion as excessive, unreasonable, not actually paid by the party, pre-empted, and lacking any basis in law or fact. Defendant will seek fees in an amount not likely to exceed $200,000.

Dated this 14th day of February, 2020

Respectfully Submitted,

ASHLEY MOODY
ATTORNEY GENERAL

By: __s/ Howard S. Dargan______
HOWARD S. DARGAN
SENIOR ASSISTANT ATTORNEY GENERAL
Fla. Bar No.: 0494089
email: Howard.dargan@myfloridalegal.com

__s/ Hughens Dolisca ______
HUGHENS DOLISCA
ASSISTANT ATTORNEY GENERAL
Florida Bar # 0099744
email: Hughens.dolisca@myfloridalegal.com
Office of the Attorney General
Consumer Protection Division
1515 N. Flagler Drive, Suite 900
West Palm Beach, FL 33470
Tel: 561-837-5007 / Fax: 561-837-5109

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of February, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I also certify that the foregoing document is being served this date on all counsel of record or pro se parties identified on the attached Service List, via transmission of Notices of Electronic Filing generated by the CM/ECF system, or for those counsel or parties who are not authorized to receive CM/ECF Notices of Electronic Filing, in another authorized manner as specified.

/s/ Howard S. Dargan___
Howard S. Dargan, Esq.

## SERVICE LIST

Lawrence J. Roberts, Esq.
(lroberts@lrobertsandassociates.com)
David W. Smith, Esq.
(dsmith@lorbertsandassoicates.com)
Lawrence J. Roberts & Associates, P.A.
249 Catalonia Avenue
Coral Gables, Florida 33134
Tel: (305) 441-7882 /Fax: (305) 441-7883
*Counsel for Defendants*